54985. SIMMONS v. THE STATE.

DEEN, Presiding Judge.

Jimmy Charles Simmons appeals from his conviction of four counts of forgery in the first degree alleging four

enumerations of error.

The evidence presented at trial established that appellant lived at the home of Homer L. Tolbert and his wife from March to October 1976. Mr. Tolbert's son suggested that his unemployed friend move in with the elderly couple in order to assist them around the house because Mr. Tolbert suffered from cancer and his wife was blind. Appellant lived as a member of the family; he did not pay rent and helped with some of the work around the house. The Tolberts had a joint checking account at the Oconee State Bank in Oconee County, Georgia. Appellant was authorized to sign Mrs. Tolbert's name to checks drawn on this account, but he was not authorized to sign Mr. Tolbert's name to checks although several other persons had signature cards on file at the bank. On many occasions, Mr. Tolbert permitted him to fill out the name of the payee and the amount on checks which had already been signed by Mr. Tolbert. During this period, Mr. Tolbert also loaned appellant money by signing blank checks and permitting appellant to fill in the name of the payee and the amount.

The cashier at a local package store testified that he cashed several checks including state's Exhibit 1-c for appellant and that all the checks bore Mr. Tolbert's signature. He also remembered several occasions when appellant was accompanied by an older gentleman although he could not identify him as Mr. Tolbert. Mr. Tolbert testified that he accompanied Jimmy to the package store several times and occasionally signed checks while sitting in the car. The store manager testified that he cashed checks for appellant which bore Mr. Tolbert's signature including state's Exhibits 1-a, 1-b and 1-d, but he did not recall seeing Mr. Tolbert with him. Late in September or early in October he called Mr. Tolbert to inquire about some checks bearing his signature which had been cashed at the store because he was curious about receiving such checks. After receiving the call, Mr. Tolbert claims he examined some of his returned checks and discovered some upon which his signature had been forged. He further claims that he noticed one of his checkbooks was missing from his dresser although he was rather vague as to when it was

discovered to be missing. He was also unable to testify as to whether or not his bank account balanced after he discovered the alleged forgeries.

Appellant was subsequently arrested and indicted. The checks in question were all cashed at the package store and their face value totaled $28.

Mr. Tolbert's testimony at trial was very confused. When questioned about the signatures on the four checks he positively identified the signature on three of the checks as being his own (state's Exhibits 1-a, 1-c, 1-d). At three different points in his testimony, Mr. Tolbert identified the signatures on two of the checks as being his own. When first asked to identify the signature on state's Exhibit 1-a, he replied: "It is, it is, yes sir." Q. "I want you to look at it very closely now, Mr. Tolbert, and tell me whether or not that is your signature. Is that your signature?" A. "Yes sir, it is." Q. "Mr. Tolbert, I want you to look at State's 1-b, and I want you to look at that very closely; is that your signature?" A. "No, no." Q. "I am going to ask you to take a look at a check marked 1-c; is that your signature?" A. "Yes, sir." Q. "Mr. Tolbert, I want you to be real careful and take a look real closely at that, look and tell me whether that is your signature or not." A. "No. I don't believe it is." Q. "I want you to look at this check and see if you have ever seen that one before, State's 1-d; is that your signature?" A. "It is, if it ain't, it is a good imitation." Q. "Mr. Tolbert, do you remember turning over some checks to the Athens Police Department which you thought did not contain your signature?" A. "Yes, sir." A. "I want you to look at those checks again one more time, all of them again, and tell me whether you have ever seen those checks before or whether you have ever turned those checks over to the Athens Police Department. I want you to be as sure as you can, Mr. Tolbert." A. "I made a mistake. That ain't mine." Q. "You are looking at State's 1-b; is that your signature?" A. "No, no, no." Q. "Take a look at State's—" A. "This ain't either, and that ain't either." Q. "This is 1-c; is that your signature?" A. "No." Q. "Take a look at State's—" A. "That one is." Q. "State's 1-d?" A. "Yes sir. That one is." Q. "Mr. Tolbert, I want you to take a look at this one more time and make sure in your mind." A. "I done made a mistake. That one is not." Q. "Is

it or is it not, State's 1-d?" A. "No. That is not mine." Q. "I want you to look at the last one, State's 1-a and tell me whether or not that is your signature, please sir." A. "Yes. That is my signature." Q. "I want you to look again, Mr. Tolbert, and make sure one way or the other, please sir." A. "That is another mistake I made." Q. "Is it or not?" A. "No."

Mr. Tolbert was also asked to identify a series of checks marked Exhibits 2-a through 2-p. He identified all the signatures as his except for 2-e. On cross examination, however, he identified 2-e, 2-k, 2-l, and 2-m along with 1-a through 1-d as not bearing his signature.

The state called as a witness a handwriting expert from the state crime laboratory who testified that after high school ". . . a person's handwriting habits become fixed barring any injuries, and it is these individual ways of making letters such as any unusual letter design or anything like that or any combination that makes your handwriting and why, therefore, it is identifiable." She went on to identify Exhibits 2-a thorough 2-p as the signatures of one person and Exhibits 1-a through 1-d as being signed by someone else. On cross examination, she testified that she was not informed as to the physical condition of the writer of the checks other than the fact that he was old. She admitted that one's handwriting may be affected if he is suffering from a degenerative disease such as cancer or if the writing is done upon a different underlying surface that is softer than usual.

1. Appellant contends that the evidence was insufficient to support a jury verdict. We agree. Except for the opinion evidence of the state's expert witness, this conviction is based upon the testimony of Mr. Tolbert. His testimony however, was terribly confused. On three separate occasions he testified that the signatures on Exhibits 1-a and 1-d were his own, and once that 1-c carried his signature. It was only after repeated questioning and coaxing by the prosecution that he recanted his previous unqualified identification. On cross examination, he identified four checks in Exhibits 2-a through 2-p as not bearing his signature although he testified on direct examination that only 2-e was not his signature. Clearly, he was not able to distinguish between

his signature and the alleged forgery. When his testimony is considered along with that of the handwriting expert, the state's case fails to offer any substantial evidence to convict defendant of forgery under Code Ann. § 26-1701.

2. Under Code Ann. § 38-109, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save the guilt of the accused." Under the evidence presented in this case, it is clear that every other hypothesis save the guilt of the accused has not been excluded. It is unnecessary to rule upon appellant's other enumerations of error.

*Judgment reversed. Smith and Banke, JJ., concur.*

SUBMITTED JANUARY 3, 1978 — DECIDED
JANUARY 26, 1978.

*Cook, Noell, Bates & Warnes, J. Vincent Cook, Edward D. Tolley,* for appellant.

*Harry N. Gordon, District Attorney, B. Thomas Cook, Jr., Assistant District Attorney,* for appellee.